IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 2 0 2006

_____ ___ _____AS, Clerk

By_____ Deputy Clerk

BENNETT MOTOR EXPRESS, INC.,

        Plaintiff,

v.

LEXINGTON INSURANCE COMPANY,

        Defendant.

CIVIL ACTION NO.

1:04-CV-1629-JEC

## O R D E R  &  O P I N I O N

This case is presently before the Court on Defendant Lexington Insurance Company's Motion for Summary Judgment [46] and on the Motion of Plaintiff to Exceed Court's Page Limitation on Response to Defendant's Motion for Summary Judgment [52]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that Lexington Insurance Company's Motion for Summary Judgment [46] should be **DENIED** and that the Motion of Plaintiff to Exceed Court's Page Limitation on Response to Defendant's Motion for Summary Judgment [52] should be **GRANTED**.

AO 72A
(Rev.8/82)

## BACKGROUND

### I.    Introduction

On October 15, 1999, a Toyota machine that was being transported by plaintiff fell off plaintiff's delivery truck and was severely damaged.   As a result, plaintiff became liable to Toyota and its insurer for the damages suffered as a result of the accident. Plaintiff timely reported the incident to its primary insurer, with whom plaintiff had a policy limit of $100,000, and to its excess insurance carrier, the defendant in this action, whose insurance coverage effectively kicked in once the loss exceeded $100,000.

Within a few months thereafter, in March and May of 2000, appraisals of the damage were done by third parties retained by Toyota's insurer and the initial assessment of the damage was pegged at approximately $270,000.   The defendant was made aware of these appraisals at the time that they were rendered and as early as September 2000 had entered notations in claims records indicating defendant's awareness that its potential share of the loss amount owed would be approximately $175,000.   Indeed, at this same time, the defendant took custody of the damaged machine and was free to conduct any tests that it wished, in order to confirm the appraisal amount.   Finally, the primary insurer had indicated its willingness to pay its $100,000 share, but had refrained from actually tendering

2

payment so as not to impair the defendant's position or continued investigation.

Defendant's response to the above events was to do nothing and instead to stall for two years in making any investigation of the loss. In response to repeated inquiries from the plaintiff indicating that Toyota's insurer was becoming increasingly impatient and threatening to sue, defendant continued to do nothing. Ultimately, on June 20, 2001, Toyota's insurer did sue the plaintiff, who was then required to expend monies defending litigation that it knew it could not win. The plaintiff had to undergo these expenses because, even though the defendant knew that it owed something, defendant refused to engage in any sort of discussion about its responsibility to pay its share of the loss, nor would the defendant engage in any settlement conversations with Toyota's insurer. The defendant also refused to conduct an inspection of the machine or to otherwise attempt to determine the value of the loss.

Specifically, after Toyota's insurer filed suit, the primary insurer again reiterated, as it had done on several occasions, that it would contribute its policy limit of $100,000 to any settlement that defendant intended to negotiate and that it was waiting to get the go-ahead from the defendant. The defendant continued to dither.

3

Finally, on November 26, 2001--over two years after the accident--defendant retained a third party to inspect this machine, and this third party indicated that the machine could be repaired for $25,00-35,000. This one-page report did not discuss the earlier surveys or indicate the value of the machine.

Thereafter, defendant declined to arbitrate the matter. As noted, as a result of defendant's recalcitrance, plaintiff had to engage in significant discovery in the underlying lawsuit. This Kentucky lawsuit ultimately settled for $135,000 in October 2002, some three years after the accident, with the primary insurer paying its $100,000 policy limit, and the defendant paying the $35,000 balance.

Plaintiff incurred costs in defending the action, prior to defendant's agreement to pay its portion of the assessed loss. Plaintiff has sued to recover these costs and the cost of bringing the present action, as well as any other penalties available as a result of the defendant's alleged bad faith. Plaintiff has averred claims for breach of contract, breach of good faith and fair dealing, and negligence.

The defendant contends that it has no obligation to reimburse plaintiff for these costs because the defendant had no contractual obligation to defend the plaintiff on the underlying claim. As a result, defendant argues, it was free to delay investigation and

4

settlement of the claim as long as it chose, even though that delay meant that its insured would be forced to incur significant expenses in a futile defense of a case that would likely end, as it did, with defendant paying some part of the claim.

The question before the Court is whether the defendant can get away with this approach. As noted, *infra,* the issue appears to be a novel one. Before discussing the uncertainties of both parties' legal positions, the Court first sets out, in greater detail, the underlying facts.

## II.   Factual Background

On October 15, 1999, a 4.5 ton Toyota injection molding machine being transported from Savannah, Georgia to Hopkinsville, Kentucky fell off a delivery truck operated by plaintiff in this action, Bennett Motor Express, Inc. ("Bennett"). (Statement of Material Facts as to Which There is No Genuine Issue to be Tried ("DSMF") [46] at ¶ 1.) Toyota's insurer Mitsui Marine and Fire Insurance Co. ("Mitsui") paid Toyota $274,889 for its loss. (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") [58] at Ex. A, LEX-0535-LEX-0536.)

At the time of the October 1999 accident, Bennett had motor truck cargo insurance with Lloyd's of London ("Lloyd's"), who is not a party to this action, up to a $100,000 policy limit. (*Id.* at ¶ 3.) Bennett was also covered for motor truck cargo by an excess insurance policy from defendant in this action, Lexington Insurance Co.

5

("Lexington").   As set forth in the insurance contract, coverage under the Lexington policy commenced upon the exhaustion of the Lloyd's policy limit and extended to $3,000,000. (*Id.* at ¶ 4; Pl.'s Resp. [58] at Ex. C, LEX-0116.)

After the accident, on November 17, 1999, defendant Lexington contacted its outside adjuster, John Grundy with Frontier Adjusters in Hopkinsville, Kentucky, and indicated that Lexington wanted a mechanical engineer to inspect the machine. (Pl.'s Resp. [58] at 2.) Mr. Grundy responded the next day, indicating that "this is a matter that is going to impact the excess carrier a great deal.  Since they are much more at risk, it would appear to be to their benefit to take a pro-active approach to review this and see what, if anything, can be done to limit the loss further." (*Id.*)(emphasis added).   The excess carrier being referred to in Mr. Grundy's correspondence was defendant Lexington.

In December of 1999, at the request of Frontier Adjusters, Donan Engineering Company completed a study of the machine to determine if the damage which occurred during shipping could be repaired. (*Id.* at 3.)  Donan's engineer concluded that the machine could be repaired, but indicated that the machine would need to be transported to a facility where it could be leveled and tested in order to determine the full extent of the damages to the machine. (*Id.* at 3.)   On January 12, 2000, a representative of defendant spoke with Frontier

6

and noted in the defendant's claims diary that the machine "may be repairable," but someone would need to look at the machine in order to give defendant an accurate repair figure. (*Id.*) The claims diary also contains notes indicating that the testing called for by Donan Engineering Company had not been started and that Toyota, the owner of the machine, did not want to work with a damaged machine and had ordered a new one. As evidenced by the absence of any further notations in the claims diary until the summer of 2000, although aware that the necessary testing had not been started, defendant then proceeded to sit on plaintiff Bennett's claim for more than six months.

On September 27, 2000, a representative of defendant noted in the claims diary that the insurer had received two surveys of the machine conducted on behalf of Mitsui, the insurer for the claimant, Toyota. (*Id.* at 4.) In the first of these two surveys, Japanese inspector Nippon Kaiji Kentei Kyokai ("NKKK") estimated repair costs for the machine to be 29,776,658 yen, translating into roughly $270,000. (Pl.'s Resp. [58] at Ex. A, LEX-0513-LEX-0520.) The second survey completed by T.M. Cargo, Inc. ("T.M.") of Nashville, Tennessee concluded, without generating its own estimate of repair costs, that the estimated 29,776,658 yen repair costs submitted to Mitsui by NKKK were fair and reasonable. (*Id.* at LEX-0528.) Also in September, there is an entry in Lexington's claims diary indicating that

7

Lexington's potential exposure was at least $174,889. (Pl.'s Resp. [58] at 5.)

On November 17, 2000, with its claim still outstanding, Mitsui contacted defendant's claims adjuster to indicate that, while Mitsui had been patient and cooperative, more than a year had passed since Mitsui had made its claim and Mitsui was "very anxious to receive complete recovery." (Id. at 5.) On November 28, 2000, Mitsui wrote Lexington to say, "Lloyd's has long given American Claims authority to pay their portion $100,000.00 and we (sic.) waiting for Lexington to confirm payment of the balance $174,889.00 . . . Please appreciate that we have paid our assured (sic.) TOYOTA over 1 year ago . . ." (Id. at 6.) On November 29, 2000, Bennett's insurance broker, David Lee of Millenium Insurance Services, wrote to Lexington:

> [F]or several weeks now the primary carrier, Lloyd's, has indicated they are ready to pay the primary $100K. To date, our client, Bennett, still has not heard from you on the very aged settlement. This claim and it's (sic.) initial reporting is now over a year old, and still remains unpaid. Both our client and we consider this unacceptable. If not resolved within the next week, the insured plans on involving Commissioner Oxendine's Department, in view of the age of the claim, unacceptable service level and aged indications that all-necessary data to settle the claim has been provided.

(Id. at 7.) The November 2000 letter was just one of several letters written, and repeated phone calls made, by Mr. Lee as he attempted to intercede on plaintiff Bennett's behalf.

On November 30, 2000, defendant generated an internal document

AO 72A
(Rev.8/82)

known as a "High-Cost Claims Memorandum" indicating that the insurer

had received documentation for a claim in the amount of $274,889,

and, accordingly, the insurer was "posting its share of $175,000 X/S

amount." (*Id.* at 6.)  Also on November 30, 2000, defendant responded

to Mr. Lee's letter, indicating that additional materials provided by

Mitsui and plaintiff Bennett were being sent to defendant's counsel,

and that defendant expected to hear back from its counsel within two

or three business days. (*Id.*)

Having heard nothing further and the claim still unresolved,

nearly a month later on December 21, 2000, Mr. Lee again wrote to

Lexington:

> I have again tried to contact you on three dates since your
> fax of 11/30/00 for an update on the claim.  I learned from
> your insured and our client today, that someone from
> Lexington Claims has talked to the third party claimant,
> Mitsui Marine of Japan and indicated that additional Mitsui
> 'invoices' were needed and that Lexington was considering
> denying this claim due to 'late reporting'?  If this report
> is true, then there are some major issues here.  First,
> when I provided a copy of the Bill of Lading on 11/7/00,
> you indicated that was all the adjustment information you
> needed, and neither Bennett or our Agency has received
> additional requests for more data ('invoices')?  Also, if
> a strategy to get out of paying a claim by alleging late
> reporting is being considered, why would that be
> hinted/communicated to a third party claimant before
> communicating with the Insured??  That is 'unprofessional'
> and 'unacceptable' and would likely cause a claimant to
> escalate to a tort suit, which will involve litigation and
> other unnecessary costs for the insured and for all
> parties.  Your fax of 11/30/00 indicated the case had been
> referred to council (*sic.*) and you anticipated hearing back
> within two or three business days, yet over a month and
> half has elapsed without any word to the Insured or our

9

Agency, including unreturned phone calls.

(*Id.* at 8.)  Doggedly trying to assist his client, plaintiff Bennett, on January 31, 2001, Mr. Lee faxed the Lexington representative handling Bennett's claim the following message: "I know you are busy, as your mail box message center was full.  As above claim is very aged, please advise status of this adjustment.  I have called five times without benefit of a return call (On 1/19/01; 1/17/01; 1/24/01; 12/21/00 and today)." (*Id.*)

On February 1, 2001, defendant's claims representative, Karen Bishop, finally responded with the words: "This is in response to your call(s) and facsimile of January 31st.  Currently, Lexington's attorney is working with the attorney for Mitsui Marine.  They have been in dialogue for awhile.  Mitsui Marine is still gathering some of the documents that they never presented. (*Id.* at 9.)  On March 19, 2001, counsel for Lloyd's wrote to counsel for defendant Lexington to ask whether Lexington had any objections to Lloyd's paying its primary policy limits. (*Id.*)

On April 18, 2001, with no resolution in sight, counsel for plaintiff Bennett wrote the following to Lexington recounting Mr. Lee's efforts on Bennett's behalf and also stating:

> Lexington has yet to articulate a definitive position with respect to this claim; since Lexington presumably has obtained all of the information that it needs -- and certainly all that it has requested -- this failure to respond is distressingly inexplicable. Not surprisingly,

10

> given the age of the claim, the claimant is anxious to settle this matter, and the underlying carrier has indicated its desire to tender the underlying policy limits of $100,000.00 in partial settlement of the claim. We see no reason, and indeed have been given no reason by Lexington, why this claim cannot be resolved in its entirety. It is in Bennett's best interests (and those of Lexington as well) for Bennett to enter into a final, complete settlement of the claim, and accordingly, request that Lexington inform us immediately of its intentions. You might note that in Georgia, insurers who exercise bad faith are subject to a considerable penalty. O.C.G.A. § 33-4-6 provides. . .

(*Id.* at 9-10.)  On April 19, 2001, defendant Lexington informed its own counsel that Lloyd's could move forward and pay its policy limit of $100,000 per vehicle. (*Id.* at 10.)

On April 23, 2001, counsel for Mitsui informed counsel for defendant Lexington that Mitsui would file suit within fourteen days if Mitsui did not receive a commitment to pay the loss amount. (*Id.*) On May 16, 2001, counsel for plaintiff Bennett wrote counsel for defendant Lexington to indicate that Bennett had not received any response to an April 18, 2001 letter that counsel for Bennett had sent to Ms. Bishop, Lexington's claims adjuster. Counsel for Bennett also demanded that Lexington clarify its intentions as soon as possible. (*Id.*)

On May 30, 2001, counsel for Mitsui sent a proposed partial settlement agreement to counsel for plaintiff Bennett and counsel for defendant Lexington.  By letter dated May 31, 2001, defendant informed Mitsui that it took exception to a provision in the proposed

11

settlement that extinguished Lloyd's obligation to provide a defense should the matter be litigated. (*Id* at 10-11.)  By separate letter dated the same day, Lexington responded to counsel for Bennett's May 16th letter by stating, among other things, that: "To the extent that the third-party claim is yet to be resolved, we draw your attention to the fact that first, Lexington is an excess underwriter and nothing can be done without primary acting first." (*Id.* at 11.)

On June 20, 2001, with the claim still unsettled, Mitsui finally filed suit against plaintiff Bennett.  At this point, nearly two years had passed since the machine was damaged and Lexington had still not completed its inspection of the machine.  Nevertheless, on June 28, 2001, counsel for Lexington wrote about the machine: "Presently [the machine] is in the process of being examined with rehabilitation in mind.  Thereafter, presumably it will be sold.  If, as we anticipate, the sale price is achieved is significant that would demonstrate that the loss claimed for has been inflated.  With luck Lexington's layer of insurance will not be reached in that event." (*Id.* at 11-12.)

On July 6, 2001, counsel for Lloyd's reiterated its position that Lloyd's would not be providing a defense for Bennett against Mitsui, but speculated that Lexington would be providing a defense "based on the circumstances of this case." (*Id.* at 12.)  On July 10, 2001, counsel for defendant Lexington informed plaintiff Bennett that

12

it has no objection to a partial settlement of the lawsuit involving Lloyd's provided that any such settlement not compromise any duty to defend owed Bennett by Lloyd's. (*Id.*) On July 11, 2001, counsel for Lexington informed Bennett that, "until such time as Lloyd's has actually paid its policy limits, there can be no obligation on Lexington to respond in the first instance to a lawsuit that seeks recovery of amounts clearly falling within Lloyd's primary policy and which may never reach Lexington's policy." (*Id.* at 12-13.)

On July 13, 2001, plaintiff Bennett responded, through counsel, "Bennett and Lloyds have indicated their mutual willingness to enter into a partial settlement with [Mitsui], thus extinguishing Bennett's underlying coverage and activating Bennett's excess coverage through Lexington. As you know, Lexington is obligated to pay claims covered under the policy. Plaintiff has asserted such a claim, triggering Lexington's responsibility to handle and respond to the claim. Quite simply, failure to respond at this point, is a failure to abide by these contractual obligations." (*Id.* at 13.) The same day Lexington responded that, "as of this writing Lloyds has not extinguished its policy cover. The 'willingness' of Lloyds and Bennett to settle in the future is a legal irrelevancy. Until such time as that occurs Lexington is an excess underwriter on a claim on which the primary cover is not exhausted." (*Id.*) Though Lexington apparently had no basis to dispute the NKKK and TM Cargo surveys, Lexington's letter

13

went on to state, "we do not believe the loss incurred will ever reach the Lexington layer of insurance so the (*sic.*) Lexington may never need to respond to the subject suit." (*Id.* at 13-14.)

On November 13, 2001, Lexington finally had an inspection of the machine completed. A mechanical engineer named W. Benjamin Evans concluded in a one-page report that the machine could be repaired for between $25,000 and $35,000 in a period of six to eight weeks. (*Id.* at 15.) Though he had been provided with both, Mr. Evans' report does not address either of the surveys conducted by NKKK and TM Cargo. (*Id.* at 15-16.)

Thereafter, because defendant Lexington refused to engage or participate in the litigation filed by Mitsui against plaintiff, plaintiff Bennett engaged in, and bore the expense of, significant discovery in the Kentucky lawsuit. Ultimately, the Kentucky lawsuit settled on October 7, 2002 for $135,000. As it had consistently agreed to do, Lloyd's paid $100,000 of this amount and defendant Lexington paid the remaining $35,000. (*Id.* at 16.)

**III. Discussion**

### A. Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

14

to a judgment as a matter of law."   FED. R. CIV. P. 56(c)).

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.  Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *(Id.* at 322-23.)

The movant bears the initial responsibility of asserting the basis for his motion.   *Id.* at 323; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990).  The movant is not required to negate his opponent's claim, however.   The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[1] designating

---

[1]   The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like.

AO 72A
(Rev.8/82)

"'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the controlling substantive law. (*Id.* at 248.) An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. (*Id.* at 249-50.) The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249-50. Thus, to

---

*Celotex*, 477 U.S. at 324.

survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## B.   Legal Issues Presented

As recounted *supra*, plaintiff had a policy with Lloyd's of London, with a $100,000 policy limit. Its policy with the defendant had a three million dollar limit and required the defendant to cover the loss only to the extent that the loss exceed $100,000. Defendant has referred to Lloyd's as the primary insurer and to itself as the excess carrier, and the Court will use the same terminology.[2] Based on all the information known to it at the time the claim was filed, the defendant knew that the loss from the accident, for which its insured was responsible, would likely exceed $100,000. Indeed, the appraisals done by Toyota's experts indicated that the damages were approximately $275,000. For two years, however, the defendant took no steps to independently dispute or confirm this estimate, even though the defendant had custody of the damaged machine. The defendant had its own test performed only after Toyota's insurer, impatient at defendant's refusal to engage in any discussion about

---

[2]   Defendant's policy with plaintiff actually indicated that plaintiff was subject to a $100,000 deductible, which deductible amount had to be satisfied before the defendant's duty to cover any loss arose. As noted, the plaintiff's policy with Lloyd's of London provided that Lloyd's would cover the first $100,000 of any covered loss by plaintiff.

17

the value of the claim, filed suit against the plaintiff.   Then, defendant had a fairly rudimentary appraisal, consisting of a one page, incomplete report, performed. As noted, ultimately, in October 2002, some three years after the accident, the case with Toyota's insurer did settle for $135,000.  Lloyd's, the primary insurer, paid its $100,000, as it had consistently agreed to do since a few months after the accident.  The defendant paid the remaining $35,000.

Thus, the plaintiff is not out any money that was owed to Toyota's insurer, because both its primary and excess carrier paid those amounts.  Plaintiff is out the money it expended, up to the time of the settlement, in defending the case brought by Toyota's insurer and in conducting discovery.  Plaintiff wishes to be reimbursed that money by the defendant, as well as attorney's fees incurred in this litigation, and any other appropriate penalty available as a result of the defendant's alleged bad faith refusal to pay.

Typically, insurance companies have no financial incentive to engage in a useless and expensive defense of a case where it is apparent that the insurance company will be liable.  To the contrary, if it is clear that an insurance company will owe money, the company has a financial disincentive to conduct needless discovery that will only add to the amount of money that the company is out for the loss. So, why would the defendant insurance company in this case stubbornly

AO 72A
(Rev.8/82)

refuse to address a claim on which all the evidence indicated it owed money, allowing defense costs to mount?  The answer:  because there was no "duty to defend" clause in its insurance contract, the defendant concluded that it would not have to pay any of these costs. Instead, the defendant was happy not only to stick these costs onto its insured, but also to act in a way that would increase the costs incurred by its insured, the plaintiff, who had dutifully paid its premiums under a perhaps naive notion that the defendant would be responsive when a loss occurred.

The problem for plaintiff was exacerbated by the fact that there was also no "duty to defend" clause in the policy that the plaintiff had with its primary insurer, Lloyd's.  This meant that both Lloyd's and the defendant apparently insisted that neither had a duty to pay costs incurred in defending the plaintiff,[3] although their duty to cover plaintiff for any meritorious claims still existed.  As noted, almost from the outset, Lloyd's indicated to both plaintiff and the defendant its willingness to pay its $100,000 policy in a consolidated settlement to be paid along with the defendant.  Also,

---

[3]   Lloyd's may have had another argument as well.  Even were there an implicit duty to defend the plaintiff, the absence of an explicit provision to that effect could arguably enable Lloyd's to contend that its total expenses for both the claim and the costs of defense could not exceed $100,000.  As Lloyd's paid the whole $100,000 to cover the claim, they would not be responsible for any costs of defense, under this approach.

19

as noted, defendant did not finally agree to settle the case until three years after the accident had occurred and after Toyota's insurer had been forced to file a civil lawsuit against the plaintiff.

Having handled many insurance cases over the years, the Court cannot remember ever seeing a case involving single insurer coverage in which an insurance company argued that while, it had a duty to pay covered claims, it had no duty to defend.  To the contrary, where there is a divergence between the two duties, the plaintiff usually claims that while there may have ultimately have been no duty to pay, because the claim was determined not to be covered, there was still a duty to defend, because the claim was arguably covered by the policy.  Moreover, the Court has never encountered a case involving dual coverage in which neither insurance company would handle the defense of a covered claim.  Thus, the present factual scenario is novel to this Court and apparently novel to the Georgia courts, if the cases cited by the parties are a complete rendition of the pertinent case law.  Ultimately, the question before this Court is whether an insurance company that has a duty to pay for a covered claim, but no explicit contractual duty to defend a claim brought against its insurer, may purposely act in a dilatory manner that will necessarily increase the costs incurred by its insured.

20

### C.   Breach of Contract Claim

#### 1.   Duty to Defend - As an Implicit Condition

In Count One of its Complaint, plaintiff alleges that defendant breached the contract of insurance between the two parties by failing to assume the duty to defend provided for in the language of the policy.  Of course, as plaintiff has now conceded, the duty to defend policy language that plaintiff initially relied upon in bringing its breach of contract claim is not a part of the insurance policy in effect at the time of the October 1999 accident.  (*See* Pl.'s Resp. [58] at 23 n.6.)  In its Complaint, plaintiff Bennett quoted from a duty to defend provision that purportedly was part of the insurance contract between Bennett and Lexington. (Compl. at ¶ 19, attach. to Removal.)  Plaintiff has explained that it made this mistake in the Complaint because the quoted duty to defend language was not from the policy at issue in this case, but, instead, from an expired excess insurance policy issued by Lexington to Bennett that was no longer in effect at the time of the October 1999 accident.

Defendant touches briefly on the absence of a duty to defend provision in the relevant insurance policy in its five-page argument in support of summary judgment, but primarily argues for summary judgment on the ground that, as an excess carrier, defendant had no duty to defend prior to the exhaustion of the primary policy limits. (Br. in Supp. of Mot. for Summ. J. ("Summ. J.") [46] at 9.)  Although

21

there is no explicit contractual language requiring defendant to defend a claim made against the plaintiff, it is noteworthy that the defendant expresses little interest in the absence of such a provision, but instead focuses its discussion on when an excess carrier's duty to defend arises.    Indeed, throughout the parties' interactions after the accident, defendant apparently did not take the position that it could abandon the plaintiff during the investigatory phase because there was no duty to defend provision in the policy.    Instead, the defendant's consistent position was that it had no duty to defend until the primary policy limits were accepted or exhausted by settlement or judgment.    (Pl.'s Resp. [58] at 19.)

This focus by the defendant suggests to the Court that Georgia law[4] or insurance common law may imply a contractual duty to defend by an insurer, even where no such explicit clause exists in the policy.    Yet, a review of the cases cited does not clearly reveal the existence of such a principle.    Indeed, the *Synalloy* case, cited by both parties, does discuss the confusion in the law concerning an excess carrier's duty to defend once a primary carrier has tendered coverage up to its policy limits.    The  opinion ultimately notes,

---

[4]    The parties have assumed that Georgia law applies, and the Court has no basis or inclination to disturb that assumption, as the briefs do not indicate to the Court where the accident occurred, where the entities are located, or where the contract was executed.

AO 72A
(Rev.8/82)

however, that Georgia law defers to the contract in determining the limits of the duty to defend, whereas the majority rule holds that this duty is governed by the allegations of the Complaint. *Cont'l Cas. Co. v. Synalloy Corp.*, 667 F. Supp. 1523, 1534 (S.D. Ga. 1983); *see also Yeomans & Assocs. Agency, Inc. v. Bowen Tree Surgeons, Inc.*, 274 Ga. App. 738, 741, 618 S.E.2d 673, 677 (2005)(internal citation and quotation omitted)("Whether an insurer is obligated to defend an action against its insured is determined by the contract.").

Nevertheless, to the extent that the principle articulated by the defendant governs this case--that the excess carrier has a duty to defend once the primary policy limits are accepted or exhausted-- defendant would appear to be in some peril. Here, the primary carrier had repeatedly agreed to tender coverage in an amount up to the limits of its policy: $100,000. That the accident victim, Toyota, would not accept this amount until a complete settlement had occurred, or that the defendant instructed the plaintiff not to accept this tender, if the tender was conditioned on a release of any further duty to defend by Lloyd's,[5] are conditions over which the

---

[5] Assuming that both insurers believed that one of them had a duty to defend, the existence of a dispute between Lloyd's and defendant as to whether Lloyd's still had a duty to defend once its policy limits had been met was just that: a dispute between Lloyd's and the defendant. Defendant could have taken over the defense of the claim, with a reservation of its right to proceed against Lloyd's for those costs later on.

23

plaintiff had no control.   The important point is that from the beginning Lloyd's was willing to pay its $100,000; its policy limits had thus been exhausted; and, therefore, according to defendant's own cited principle, defendant's duty to defend should have arisen at this point.[6]

In short, as the defendant's discussion of this matter is so abbreviated and the law cited is so murky, the Court has no clear understanding of what legal principle governs.   That fact alone counsels against granting summary judgment, although it means that prior to any trial, both parties will need to do a better job of articulating the law on this point, instead of leaving it to the Court to figure all of this out.

---

Indeed, there is no scenario under which the plaintiff would have ever had to pay any of the loss to Toyota. That is, if the loss was under $100,000, Lloyd's would pay the entire claim; if it was more, defendant would cover the excess up to 3 million dollars.   As Toyota was only claiming a $275,000 loss, there was no possibility that plaintiff would ever have to pay anything on the claim.   Thus, whatever obligation defendant may or may not have had to defend plaintiff--had the claim been potentially higher than the policy limit for example--plaintiff had no contractual duty to defend defendant on claims for which plaintiff had no conceivable exposure.

[6] Again, as noted supra at n.3, if Lloyd's did have a duty to defend as a primary carrier, arguably the costs of such a defense would be included in the $100,000 policy limit given the absence of an explicit duty to defend provision.   If so, by agreeing to pay its $100,000, any cost to defend over and above that amount arguably rolled over to defendant, if indeed defendant's duty to cover and respond to the claim kicked in whenever, and however, Lloyd's $100,00 limit was reached.

## 2.    Duty to Pay Clause

Plaintiff also contends that, even without the duty to defend provision, defendant breached its contract with plaintiff by failing to pay the claim on a timely basis. (Summ. J. at 18.)  In making this argument, plaintiff relies on the "When Loss Payable" provision of the policy which provides that, "[t]he amount of a loss for which this Company may be liable shall be payable sixty days after proof of loss, as herein provided, is received by this Company and ascertainment of the loss is made either by agreement between the Insured and this Company expressed in writing or by the filing with this Company of an award as herein provided." (*Id.* citing Pl.'s Resp. [58] at Ex. C, LEX-0128)(emphasis added).

The Court concludes that the defendant was not in breach of the above provision.  This provision sets out, as a condition precedent to triggering a payment deadline, an agreement between the defendant and the plaintiff as to the amount of the loss or the issuance of an award setting out that amount.  Neither occurred here until the case was actually settled; thus, the 60 day period did not expire.[7]

---

[7]  As discussed *supra,* an agreement between the plaintiff and the defendant was impossible here as the defendant refused to cooperate in any effort to ascertain the loss, until the very end, at a time when plaintiff had already had to expend monies to defend the action as a result of defendant's recalcitrance.  The cited provision will never operate to hold liable for defense costs an insurer who has no obligation to defend, because the event triggering payment will always occur after the costs to defend have been incurred by the

25

Accordingly, the Court finds this argument by plaintiff to be unpersuasive.

Nevertheless, for the reasons stated *supra*, the Court **DENIES** defendant's Motion for Summary Judgment as to Count One of the Complaint [46].

### D.    Breach of Good Faith and Fair Dealing, as well as Bad Faith Under O.C.G.A. § 33-4-6

In Count Two of its Complaint, plaintiff alleges that the defendant breached its duty of good faith and fair dealing, in violation of O.C.G.A § 11-1-203.  Plaintiff also alleges that, by failing to paying within a period of sixty days after plaintiff made its claim, defendant violated O.C.G.A. § 33-4-6. (Compl. at ¶ 27, attach. to Not. of Removal [1].)  Defendant has moved for summary judgment on this claim for bad faith.[8] (Summ. J. at 9.)

Section 33-4-6 of the Georgia Code provides recovery for the insured where the insurer refuses to pay a covered loss in bad faith. Specifically, the provision provides:

> In the event of a <u>loss</u> which <u>is covered</u> by a policy of insurance and the <u>refusal of the insurer to pay</u> the same <u>within 60 days after a demand has been made</u> by the holder

---

insured.

[8] In its motion for summary judgment, the defendant did not separate its discussion as to particular claims.  In its brief five-page discussion of the matter, the defendant simply relied on the fact that it did not have a duty to defend.  In its Reply Brief, the defendant focused a bit on some of the corollary claims.

26

of the policy <u>and a finding has been made that such refusal was in bad faith</u>, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $ 5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer...

O.C.G.A. § 33-4-6 (2005)(emphasis added). Bad faith means "a frivolous and unfounded refusal to pay a claim." *United Servs. Auto. Ass'n v. Carroll*, 226 Gap. App. 144, 148, 486 S.E.2d 613, 616 (1997). The insured bears the burden of proving that the insurer's refusal to pay the claim was made in bad faith. *Allstate Ins. Co. v. Smith*, 266 Ga. App. 411, 413, 597 S.E.2d 500, 502 (2004) (citing *Southern Fire & Cas. Ins. Co. v. Northwest Ga. Bank*, 209 Ga. App. 867, 434 S.E.2d 729 (1993)). Importantly, "[p]enalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact." *Id.* Indeed, "[a] defense going far enough to show reasonable and probable cause for making it would vindicate the good faith of the company as effectually as would a complete defense to the action. *Moon v. Mercury Ins. Co. of Georgia*, 253 Ga. App. 506, 507, 559 S.E.2d 532, 534 (2002)(internal citation and quotation omitted).

Applying the pertinent elements of the statute: there was a loss that was covered by the policy; the insured (the plaintiff) repeatedly made demands for the insurer (the defendant) to pay; the insurer delayed more than 60 days before paying; and a jury could

27

well conclude that the defendant's refusal was made in bad faith, at least up to November 26, 2001 when the defendant finally got around to obtaining its own appraisal of the damaged equipment.  This November 26, 2001 date is significant, because up to that time, the defendant had no reasonable ground to contest the claim, and there was no disputed issue of fact about the defendant's exposure.  That is, Toyota's insurer, shortly after the accident, had obtained two appraisals indicating that the loss was approximately $275,000.  That Toyota's insurer found this valuation persuasive is evidenced by the fact that it actually remitted $274,889 to its insured, Toyota, for its loss. (Pl.'s Resp. [58] at Ex. A, LEX-0535-LEX-0536.)  That the primary insurer, Lloyd's, found this valuation persuasive is evidenced by its almost immediate agreement to pay its policy limits of $100,000.  Finally, defendant, itself, must have thought that the valuation was accurate, as it placed $175,000 in reserve for its liability on plaintiff's claim.  Had it actually had any questions about the victim's appraisal, there was no reason that defendant could not have had its own independent appraisal conducted.  Indeed, the defendant had custody of the damaged machinery.  Thus, the Court concludes that certainly up to November 26, 2001, there is a disputed issue of fact as to whether the defendant exhibited bad faith.

Once the defendant actually had an appraisal done, in November 2001, defendant could argue that there was a dispute about the loss

28

because this appraisal, as abbreviated and conclusory as it may have been, showed a valuation much less than that obtained by Toyota's insurer. Yet, as it is not clear from the facts before the Court how much weight the defendant should reasonably have given to the appraisal it had conducted, the Court also concludes that there is a disputed issue of fact as to the defendant's bad faith after that date.[9]

Accordingly, the Court **DENIES** Lexington Insurance Company's Motion for Summary Judgment to Count Two of the Complaint [46].

### E.    Negligence

In Count Three of its Complaint, plaintiff alleges that defendant negligently handled plaintiff's claim, thereby causing plaintiff to incur expenses it otherwise would not have been required to incur. (Pl.'s Resp. [58] at 26.)   Plaintiff contends that defendant's failure to respond reasonably or meaningfully to plaintiff's claim caused Mitsui to sue plaintiff. (*Id.*)   Plaintiff points to the fact that defendant placed $175,000 in reserve for plaintiff's claim as evidence that defendant knew its excess layer of insurance would be impacted. (*Id.* at 26-27.)   More specifically,

---

[9]   Generally, any issues of bad faith are to be resolved by a jury.   Where an insurer acts reasonably under applicable Georgia standards, the Court may decide the issue of bad faith as a matter of law. *See Nguyen v. Lumbermens Mut. Cas. Co.*, 261 Ga. App. 553, 555-56, 583 S.E.2d 220, 223 (2003).

plaintiff argues that defendant is liable for negligence for breaching its duty to investigate plaintiff's claim, breaching it's duty to settle, and, finally, for breaching a duty to defend that arose, not out of contract, but by virtue of defendant's delayed handling of plaintiff's claim and failure to investigate. (*Id.* at 27–31.)

"To state a cause of action for negligence in Georgia, the following elements are essential: (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." *Berry v. Hamilton*, 246 Ga. App. 608, 608–09, 541 S.E.2d 428, 429–30 (2000).

### 1.    Duty to Investigate

Plaintiff cites *Anderson v. Southern Guar. Ins. Co. of Georgia*, 235 Ga. App. 306, 508 S.E.2d 726 (1998), for the proposition that a insurer's failure to investigate can give rise to a breach of the duty to defend. While this statement is accurate on its face, what plaintiff fails to mention is that the policy involved in *Anderson*, unlike the policy involved in this case, contained an explicit duty to defend provision. For this reason, much of the holding of

30

*Anderson* is inapposite to the case at hand.

The *Anderson* case represents a typical kind of insurance dispute that courts review. Specifically, a policy will set out the conditions of coverage and will also set out a duty to defend by the insurer. Nevertheless, when determining, after a review of the claim, that it had no obligation to cover the loss, an insurance company will also sometimes contend that it also had no duty to defend the litigation. *Anderson* reiterates that, before making that determination, an insurer has a duty to conduct a reasonable investigation into the claim, and if that investigation reveals facts that arguably place the claim within the policy coverage, the insurer must then enter a defense on behalf of the insured, regardless of whether it ultimately must cover the claimed loss. (*Id.* at 309, 730.)

As noted, the *Anderson* facts are not the facts before this Court. Nevertheless, a credible argument could be made that, where there is no duty to defend provision, one can still extrapolate a basic duty to investigate by the insurer. Indeed, unless the insurer is willing to wait passively and pay whatever amount is awarded in litigation that is defended by an insured who will not be required to pay the damages, and thus who may have little incentive to aggressively defend the claim, one cannot envision how the process will ever work without the insurer conducting some basic

31

investigation.[10]  In fact, as noted supra at n.5, plaintiff had no

potential liability for any part of the claim here, as the two

policies together amply covered the claimed loss.  Thus, defendant is

really arguing that plaintiff had a duty to defend the defendant on

the claim.   Defendant has cited no Georgia authority that would

recognize such a duty, however.

Thus, while the Court is not at all certain what the parameters

of such a duty to investigate in a case like this might be under

Georgia law, if the latter would even recognize this duty, the Court

**DENIES** defendant's motion for summary judgment on this part of

plaintiff's negligence claim.

---

[10]   On this point, the Court is uncertain why the plaintiff
expended monies investigating and defending the case.   Had the
plaintiff simply stipulated to Toyota's claim for $275,000 at the
time suit was filed--which was the amount that all the evidence
suggested to be the appropriate amount--the Court is not clear how
defendant would have gotten out of paying its $175,000 portion of
that judgment.   It would have been the defendant's own fault that it
had taken no action to dispute this amount.

Yet, for reasons unclear on the record, the case settled for
$135,000, not $275,000.  By not stipulating to the claim and by
defending the action, the plaintiff got the case to a posture where
the defendant had to pay only $35,000, not the $175,000 that the
defendant had initially put into reserve.  Under a *quantum meruit*
approach, plaintiff's refusal to take what might have been a cleverer
tack saved the defendant $140,000.   Surely, payment of the
plaintiff's costs in defending the action, at least up to that
amount, would be fair under an equitable approach, regardless of
whatever legal principles apply.  Indeed, whether or not defendant
had a duty to defend plaintiff, the insurance policy presumably did
not require the plaintiff to defend the defendant.  See n.5 supra.

32

### 2.   Duty to Settle

In support of its argument that defendant breached its duty to settle, plaintiff argues:

> When confronted with all information that would indicate the loss would exceed $100,000, Lexington still failed to participate in the settlement of this claim.  Even when Bennett was threatening suit, Lexington still failed to participate in settlement discussions since the primary policy limit had not be 'exhausted.'  But Lexington created a costly and wasteful impasse by failing to investigate the claim where it could have actively and meaningfully participated in settlement discussions.

(Pl.'s Resp. [58] at 31.)

In Georgia, "the insurer is negligent in failing to settle if the ordinarily prudent insurer would consider choosing to try the case created an unreasonable risk." *Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 685, 580 S.E.2d 519, 521 (2003). The *Brightman* case presents the familiar scenario in which an insurer refuses to settle with the claimant at an amount up to the policy limit and thereafter the claimant received an award greater than that policy limit, leaving the insured on the hook for the excess as a result of the insurer refusal to earlier settle. *Brightman* also contains a twist involving the interaction of another insurance company in the settlement mix, but the Georgia Supreme Court indicated that the action or inaction of that second company did not relieve the defendant of the duty to settle under the circumstances before the Court.

33

Again, the odd facts before the Court do not fit the paradigm case. Here, the defendant ultimately settled and paid its portion. The plaintiff was not left owing more money because the defendant had refused to settle. What plaintiff is really arguing is that the defendant's refusal, in bad faith, to participate in a settlement process that it knew would almost certainly trigger its coverage obligations unnecessarily resulted in costs to the plaintiff. Thus, the plaintiff is alleging more a duty to negotiate in good faith, as opposed to a duty to settle, which act the defendant ultimately took.

Nothing about the defendant's conduct in this matter is praise-worthy. Whether one can extrapolate principles from the duty to settle cases to sweep in defendant's conduct is something that only the Georgia courts can ultimately decide. It is this Court's duty to try to predict what they would do, which is very difficult in this situation. As the Court has denied other aspects of the defendant's motion for summary judgment, it likewise **DENIES** such a motion as to this prong of the negligence claim.

In summary, as to Count Three of the Complaint, the Court **DENIES** defendant's Motion for Summary Judgment [46].

## IV.   CONCLUSION

The Court has denied defendant's motion for summary judgment as to all three claims in the plaintiff's Complaint. The Court has candidly acknowledged its uncertainty about how Georgia appellate

34

courts would apply their established principles to a case such this.
Obviously, it would make some sense for the Georgia legislature to
consider whether Georgia should require all insurance policies to
include a duty to defend provision in order to avoid the unfair
situation that faced plaintiff and to avoid the costly litigation
that will predictably occur whenever there is not a duty to defend
provision. Placed on notice that such a duty would exist, absent an
explicit waiver coupled with specific language setting out the
procedure to be followed when a claim is made, insurers would be able
to charge appropriate premiums to cover this cost. Alternatively,
the Georgia appellate courts will be in a position to indicate the
extent to which their existing caselaw can be expanded to cover this
unique situation. It may be that this Court or the Eleventh Circuit
ultimately decides to certify the issues to the Georgia Supreme
Court. The record provided by the parties is not yet concrete enough
to do so. Accordingly, a trial will permit the facts to be clarified
in the event of a certification.

Alternatively, the parties can attempt to settle the matter. As
the Court has noted, the defendant's adversarial conduct toward its
own insured was not the behavior that one would hope an insurance
company to exhibit. An insured pays its premium and justifiably
expects its insurer to behave professionally when a claim is filed.
Plaintiff's justifiable expectations were not met by the defendant in

this case.  A settlement negotiation may persuade the defendant to take a higher road than it has previously traveled.

For the foregoing reasons, the Court **DENIES** Lexington Insurance Company's Motion for Summary Judgment [46] AND **GRANTS** Motion of Plaintiff to Exceed Court's Page Limitation on Response to Defendant's Motion for Summary Judgment [52].

SO ORDERED, this ___20___ day of March.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

36